May it please the Court, my name is Joseph Fagliotto. I represent the appellants and the plaintiffs below. On the brief with me is Ms. Jamie Miller and Mr. Gilbert Messina. The charge that we have made is a violation of Section 7 of the Clayton Antitrust Act, and our authority to proceed is under Section 16 of the Clayton Act, which allows private persons to bring suit. We are challenging the largest acquisition in the beer company or industry, which was over $106 billion by Anheuser-Busch ABI. It's important to note that Anheuser-Busch is not the old Anheuser-Busch. This is the Inbev ABI who came in and purchased Anheuser-Busch, then immediately purchased Modelo, a Mexican brewing company, of which we have discussed in another case. And now they have come in — But let me ask you, why is this case different from that case, the Edstrom case? Why is this different from the Modelo, the fact that that was approved? Well, there are two reasons why, Your Honor. The first reason is, is that in this case, the purchase of Saab, which is the South African brewing company, eliminates Saab as a competitor in the United States, period. It hands it over to Molson, and now, instead of three brewing companies in the United States, there are two. They occupy 71 percent of the beer in the United States. And that combination, the so-called — they like to use the American brewing names rather than their own, but they call it the Miller-Coors. And the Miller-Coors was a combination of the African company and of Miller, and Coors was a combination of the Canadian company, Molson, and Coors. I have a couple of questions that I think are addressed in passing in the briefs, but maybe you can illuminate them for me. Number one, transaction is closed, correct? Transaction is what, Your Honor? Closed. Closed. Well, I will say this. The Court has not finalized the judgment. It's been two years. There's a lot of issues with regard to it. Okay. So what — I thought that essentially, though, it was approved and closed in October of 2016. Is that right? They have gone ahead with it. They have consummated it. But as I point out, Your Honor — Okay. Well, I'll use the word consummate then, rather than closed. The transaction has been consummated. So then the question is, what relief are you seeking then at this point? Well, first of all, the first thing we're looking for is to have the decision by the lower court reversed, that we be remanded to that court, that we be allowed to at least plan the purchase by Molson of the South African company. So they now control 71 percent of the brewing in the United States. Are you, in effect, asking for an unwinding of the transaction? Absolutely, we will ask for the unwinding of the transaction. It's the combination of the two largest brewing companies in the world, number one and number two, not only in the world, but in the United States. And the idea that the decisions by the Supreme Court absolutely apply here. And those cases have never been reversed. And I wanted to show one — make one point to Your Honor, because I had the opportunity to appear before you before in the case that is being used against me at the moment. But — okay, that's show business. But — That's called precedence. Yes. Okay. Well, precedence is the Supreme Court. Correct. And Your Honor may recall that you ruled at that time, and the court below ruled, that in this particular case, there was no increase in concentration. And in that other case and in the court below, the courts ruled that increase in concentration was a necessary element to state a claim under Section 7. And it is our position that that is not correct. And the Supreme Court has made that clear in a number of cases, starting, of course, with the Falstaff case, which we argued before. In Falstaff, the — Falstaff wanted to go into New England, never got to go into New England. Nonetheless, it was stopped because — there was no concentration, obviously. It was stopped because they were a potential competitor. But you put — in this case, with respect to the U.S. market, does the concentration stay the same, or does it change? It has changed somewhat because Molson — Molson, who owned half of — or not quite half of the so-called Miller Coors venture, now owns all of it. So they acquired another 12 percent of the market. So now, instead of three competitors — or three major competitors — and by the way, when I say major, the lowest one of them is more than eight times the next closest competitor in the United States. But now, instead of three, there are two. And El Paso Gas is another decision by the Supreme Court in which there was no initial concentration. The company never actually entered into the United — into California, but was a potential competitor. And here we had someone, obviously the second-largest brewing company in the world, who would be a potential competitor and was a potential competitor. They weren't really a potential competitor. They were an actual competitor, right? And I would say that, also, it's very important, especially, you know, not only to the beer industry — well, the beer industry in the United States. And that is — and that is that the one who took it over is Molson. And Molson has agreements of cross-brewing with ABI in other countries throughout the United — throughout the world. So let me — let me get this straight, though. I just want to make sure that I got the facts correct, that SAB had to divest its domestic business, is that right, according to the DOJ? The domestic — there had to be a divestment by SAB of the domestic beer company? Yes. The United States required — and it was suggested, by the way, Your Honor, because it worked in the Modelo case for them. And they — and they suggested that they would sell or SAB would sell — the South African company would sell its interests in the Miller Coors joint venture, which had 25 to 30 percent of the — And is that the U.S. — that's in the U.S. market, correct? That's in the United States market. I'm just trying to — okay. Okay. That's right. And — But is — is SAB — I guess I call it S-A-B, SAB, you're calling it — is it — you're now saying, however, that it still remains a potential competitor? Yes. If it — Can you explain that to me? Yes. If it did not — if it did not sell its interests in the United States in Miller Coors, then the South African company would still be an actual competitor, now potential competitor. An actual competitor was actually eliminated from the market. South Africa had 58 percent of this group, and Molson Coors had the remaining part, 42 or so. And South Africa had its own brands and was its own competitor, competing against — even against the venture, although they would share the profits. But definitely competing against ABI or Anheuser-Busch. And then Anheuser-Busch bought all of South African brewing company throughout the world. What is important is that the sale or the purchase by Molson of the South African interests is contingent upon ABI being able to buy out all of South Africa. And I will say this, too, if I might. The government does a great job in a lot of different areas, and there's big controversy about this, nationally speaking. And this is one of the reasons why the Congress gave the power to individuals under Section 16, because individuals would be moved by economic reasons and not by any political reasons. As a result of that, the Supreme Court has a very strong statement that it made in the American Stores case, in which it said that in private actions, what the private party should be going after and what is very — and what is the easiest solution is a complete divestiture, so that there's not — they're not interested in negotiations like the government does sometimes. But I think that that has changed. I think people have understood that with the new cases, that they're not doing those kinds of negotiations, and they're reexamining them because they only last for a few years, and then, you know, then they don't mean anything. But the problem is, is that the court below thought, okay, that's it. The government has done their deal, so, you know, what are you doing here? Get out of here. And that has nothing to do with the enforcement of the law. It's interesting. The Supreme Court says that it's a policy of the United States to have organic growth rather than merger, because organic growth creates jobs, creates demand, creates new facilities, things like that, whereas a merger — they say this in footnote 72 of the Brown Shoe Case — a merger, on the other hand, results in firing people, shutting down plants, the product goes down the tubes, it's not very good, and the production is — and the production and output is limited. And so that's the policy of the United States. That policy was followed by the seven straight Supreme Court decisions, and they're all very clear, and very small amounts. I mean, in the Alcoa case, the merger was stopped where they purchased less than 2 percent. I think it was 1.3 percent. And so the point is, is that they were trying to stop the mega-mergers, which were having an adverse effect, according to the Supreme Court, and contrary to the policy established by the United States Congress. I think you asked for leave to amend. We have asked for leave to amend, and we've also asked for — What would you further allege if you were given an opportunity? We would, first of all, obviously allege what has taken place since then. We were not allowed discovery with regard to that. There have been substantial changes that have been made in the market itself. There have been acquisitions by ABI of craft brewers throughout the United States. There have been efforts by them to control their distributors such that their distributors — they own almost all the distributors, over 600 throughout the United States. They have exclusive agreements. Nobody can — You would basically say some of what you were talking about might come to pass — has come to pass. Yes, Your Honor. It definitely has. The prices have all gone up. Mexican beer has just skyrocketed. After what they did — there's something very interesting with regard to — one circuit, the Seventh Circuit, analyzed the Supreme Court decisions. And this was Judge Posner, and I think that you would agree that not necessarily a — most of the time, a fan of private antitrust work. But he said, these cases have not been overruled. And even though I may disagree with them, they have not been overruled. And this is what they — the way he determined it. He said that if it's a nontrivial transaction and the elimination of a significant competitor, that was it. They didn't care even if the prices went up or didn't go up. That was it. And the reason was, is that the law at that time was with regard to — it included both the political importance of the merger law. And that's the way Judge Posner stated it very clearly. And here, there's no question, it was not a nontrivial transaction. It was $106 billion, the largest ever, and the elimination of a very significant rival, which was South African Brewing Company. And if it pleases the Court, I have apparently a minute, which I would like to reserve for rebuttal. Thank you. You may. Thank you. Your Honors, I'm Jonathan Evan. I'm arguing today for Anheuser-Busch, InBev, or ABI. I would like to actually begin with a brief couple of comments on the facts that Mr. Aliotto suggested that they would add into a complaint. One is the suggested fact that ABI owns almost all the distributors. ABI has never owned more than 10 percent of the distributors. I believe that's in their complaint. And that is in the consent decree with DOJ that ABI has committed never to own more than 10 percent of the distributors, of its own distributors, non-distributors in the U.S. With respect to what he said will come to pass, has come to pass, I just note that, for instance, their complaint in paragraphs 40 and 41 claim that in the two years following Modelo and following this Court's Edstrom decision, craft beer has grown over 17 percent while the rest of the market remained the same or went down, and that there are 4,000 craft brewers in the U.S. So nothing that they have said will come to pass have come to pass. It's still a drop in the bucket, though, craft brewers. It's, I believe, now about 15 percent of the market, craft brewers. So it's not a drop in the bucket anymore. It is a big business. I want to start maybe by pointing out, because I think this is rather unusual, what appellants here argue, they say that they want this Court to reverse the decision of Judge Aitken. But in fact, their argument hinges on this Court finding that at least three appellate decisions have been wrongly decided on each one of our main arguments. First of all, as mentioned in Mr. Alioto's argument, this Court's Edstrom v. ABI decision, where we have cited that case for the proposition that an acquisition that occurs entirely outside of the market and has no effect in the market cannot violate Section 7. What about the argument that now we have two major competitors instead of three, so there is an increased concentration? So I just don't think that argument is correct. What SAB Miller has stopped directly competing in the U.S. in 2008. It has essentially merged with Molson in the joint venture that is Miller Coors. And it remained an actual competitor in the U.S. only insofar as that its brands continue to be sold actively in the U.S. And its brands continue to be sold and brewed in the U.S. by the Miller Coors Company. It transferred its entire U.S. business to Miller Coors, as did Molson. And that was a complete merger that went through DOJ and got approved. And I understand that appellants don't like it, but that's not the merger before this Court today. And so there was no elimination because prior to the acquisition of SAB, Miller Coors sold the Miller brands, and the Miller brands were on the shelves competing directly with ABI. And after the closing of that transaction, which occurred in October of 2016, Miller Coors continues to make exactly the same brand in the same breweries in the U.S., and they're continuing to be sold in the U.S., just like before. Is it just a question of a different distribution? It's not even a question of a different distribution. They have the entire thing. Miller Coors is a separate entity that has never changed. The only change is who holds the share in Miller Coors. So as I said, so we pointed to Edstrom in that context, and appellants, I think, agree that that Court, that decision is on all fours with this one. And what they say in their reply is, quote, it's directly contrary to the holding in El Paso Natural Gas. So this Court apparently got it wrong. Next, on the issue of irreparable harm, we cited TALIF v. Southwest Airlines, which is a Northern District of California case from 2011, which dismissed with prejudice a complaint seeking divestiture to remediate, quote, financial injury, unquote, which is the same kind of injury that's alleged here. And that case was affirmed by this Court in 2014. Appellants do not even try to distinguish this case. Instead, what they just say is it, quote, conflicts with the holding in California v. American Stores Corporation. And then last, and that claim, by the way, is particularly notable because the Ninth Circuit actually cited California v. American Stores in its affirmance. And then last, we cited for the issue of balance of hardship in a circuit case, Ginsburg v. New York. In this case, plaintiffs brought a challenge to an acquisition in the beer business. And there, the Court found, quote, that remedial equities balance overwhelmingly in favor of denying divestiture. And appellants, again, do not try to distinguish this case but simply say that it was wrong and, quote, conflict with the holding in California v. American Stores. That's their reply at footnote 15. So I want to quickly speak to, first of all, the transaction itself, then a little bit about the remedy, which Your Honors have raised, and then the issue of whether there is futility in terms of the amendment. So in terms of the transaction, I think the we made pretty clear in our papers what the structure was. S.A.B. Miller, the plaintiffs did not itself brew or sell beer in the United States since 2008. It did that through Miller Coors. And the transaction that we have announced, that ABI has announced in November 11 of 2015, was for the acquisition of S.A.B. Miller's beer business outside of the United States only. ABI did not intend to acquire, did not acquire any beer business in the United States. Instead, as part of the transaction, as mentioned before, Molson Coors bought the S.A.B. stake in the joint venture, in the Miller Coors joint venture. Mr. Aliotto, I believe, said that there was somewhat of a change in concentration. That's just not true. Miller Coors sells the exact same beers that it did before the transaction. And that is the fundamental flaw with the complaint in this case and with Appellant's case. That is exactly what happened in Edstrom. We had a deal where what was acquired is only the outside of U.S. business. There was nothing that was acquired in the U.S. That portion of the business went to the joint venture that was acquired, that took part before the deal in distribution and, in this case, also the brewing of the beer. And ABI got none of it. And in Edstrom, just like here, the district court found that that's dispositive of the case, and we believe that was correct, and that went up to the Ninth Circuit, as your Honors are aware. And the Ninth Circuit found, quote, the challenge transaction does not increase ABI's market share or the concentration in the U.S. beer market. Therefore, plaintiffs fail to plausibly allege a prima facie case that the challenge transaction is anti-competitive. That is exactly what happened here. Now, in terms of the, as I also mentioned, there is no, this issue about whether we eliminated a potential or actual competitor. As I said, there was no elimination of an actual competitor because, as I said, Miller Coors sold and brewed before and sells and brews after the exact same beers, all the Miller brand beers. As to the cases dealing with potential competition that are relied upon by appellants, those cases are also completely irrelevant here because SAB was never a potential entrant. As your Honor stated, I think a potential competitor is somebody who is on the edge of the market looking in and contemplating, am I going to bring my product to the market or am I not going to bring my product to the market? And the Supreme Court has found in several of the cases that are cited by appellants, like El Paso and others, that that standing on the edge in and of itself may have a competitive effect in the market. So when it's true, SAB did not stand on the edge of the market thinking whether Miller beers are going to be brewed and sold in the U.S. They were brewed and sold in the U.S. all along. They were just brewed and sold in the U.S. by a different entity, Miller Coors, since 2008. One thing, I'm going to go back to the possibility of amendment because the district court case I'm just looking here is from 2016, is that right, when this was in the district court? Yes, it is. And that's when the transaction in 2016 was consummated. Yes. But we now have other things that have happened, and he's talked about even this increase in the craft beer, the price issue. So why, even if we agreed with your position, why wouldn't we permit an amendment? Well, so I think that I understand that things have happened. So first of all, I think we ought to judge that the way the judges looked at it back in October of 2016. And Judge Aiken devoted most of her decision, actually, to the question of futility. She went through the issues and said, look, I looked at all the papers, all the facts that they gave me, they put in the facts that they now say they would add about the Eden Brewery and similar things. Those papers were all before Judge Aiken, and Judge Aiken found that that would be futile. The one other theory that at least in their papers they say they would add is the theory that was proposed by the DOJ in the complaint that they filed. That theory says that because of increased contact outside of the U.S., there may be some effect in the U.S. That theory has never been adopted or relied upon by any court that we are aware of. It was never brought by DOJ outside of the context of a consent decree, as far as I can tell. And the only claim against that issue and what DOJ did is essentially, as you heard now, DOJ did not do its job right. It did not extract enough from ABI in the consent decree. That strikes me as exactly the kind of argument that should be heard by the D.C. Circuit or the D.C. District Court that is overseeing the consent decree, not by a different court. Well, that was my next question, and then I want to go back to the amendment possibility. Based solely on the docket entries, et cetera, what is the status of this D.C. court? It is pending right now. Simply pending. Yes. What's pending? The decision by the court. The DOJ has, comments have come in. DOJ has moved for entry of final judgment. There was a small amendment given the change in DOJ personnel. They wanted to add some things, and that was changed, I think, a couple of months ago, and it is awaiting Judge Sullivan's decision. For a final consent decree? Yes. For a proposed final judgment. Proposed final judgment. Okay. Now, on this other point about the impact domestically of foreign conduct, you said that there's not been a case, you know, supporting that theory. But if it's not a wholly illegitimate theory and there's a basis for an allegation of that, why wouldn't that be an appropriate basis for amendment? And then if you why wouldn't you be able, if you want, to file a motion to dismiss and the issue is on the table? Because I think, Your Honor, so this is a theory that plaintiffs have never even mentioned before. They never raised it before, even in their papers to the district court, which came after the consent decree came out. They still did not adopt it or mention it or suggest that that is a theory that they're going to follow. The theory is completely untested. I don't think it holds water, but that's neither here nor there. And what's most important is that this is a theory that DOJ has already stated gives rise to concerns that DOJ believes are completely addressed by the consent decree. So if somebody thinks DOJ is completely avoiding and chilling its job and not doing its job correctly and did not extract enough concessions from ABI, I don't think it's the correct course to allow private plaintiffs to amend and start anew in a different court when there is a court that's already considering exactly that question. Well, if that theory were to hold true, this whole case would be out of court, so to speak, and basically abdicate everything to the DOJ's approval, which is, of course, what they're not agreeing with. So I'm not sure why, if that's true, why wouldn't we just say stay this case or throw the whole thing out because the D.C. District Court and the approval of the consent decree are really what's at issue here? So I do think that there is a serious limitation on private plaintiffs bringing cases like that, and many courts have found that, especially in the context when they're seeking divestiture after the deal has closed because DOJ has approved it and we cited TALIF and we cited Ginsburg v. ABI, and I'm not going to have time to speak about those, unfortunately, but those are separate reasons why this is completely, we believe, any amendment would be futile. They can't get over irreparable harm. They can't get over balance of equities no matter what they do, and I'm not aware of a single case in the history where any courts ordered divestiture on the basis of a private plaintiff, in this case several private plaintiffs, bringing a case. So if you're correct on the injunctive and the other remedies that you couldn't get over the public interest or irreparable harm, would there even be any need to do that in this case? I think these are separate bases. The court below has never reached those bases because I think Edstrom was so clearly on all fours that the district court just said, you know, this is clearly something that cannot pass master and any amendment would be futile because the nature of the deal is not going to change. And so in the original complaint, the appellants were sort of trying to say that in fact this is a straight up merger and that ABI is going to have 71%, but in their papers and the motion to dismiss they had to concede that in fact there is no acquisition in the U.S. and that everything goes to Molson Courts and ABI is not getting anything. Once that became sort of an issue that is moot because everybody agreed or undisputed at least, then the district court went with the substance and followed Edstrom to the letter. That doesn't mean that there aren't separate bases and I think here there are separate bases. What they are arguing is that these 19 beer drinkers are going to pay a little more if they're right about everything for beer. That is monetary damages that clearly is compensable and requires no injunction, let alone an injunction that, you know, causes the restiture and breakup of a deal of $106 billion that involves also Molson and plenty of other entities outside of the U.S. It is true that they say that there will also be diminution of choice, but they claim in their complaint that right now their choice is 4,000 different beers. Even if they could somehow show that this would go all the way down to 3,900, I still think that's going to be a hard sell for them to say that that justified the kind of remedy that they seek. And as the court in Ginsburg found very aptly on exactly the same issues, once that is the issue, that you have some beer drinkers who say and bring allegations and say we think the market is going to be less competitive, and in Ginsburg it was a straight up horizontal merger, not like here. Once the deal is closed, the balance of equities tilts so obviously in favor of the merging parties that private plaintiffs are not going to be able to sustain a claim as a matter of law. That's exactly what the Eighth Circuit said. Thank you. Thank you very much, Your Honor. I apologize for going on. Well, I'm going to give Mr. Alito a little leeway as a result. Thank you very much, Your Honor. First of all, I would like to point out that we did file a request for judicial notice and or supplement, and it has some of the things that have happened before, and I mean since then. And for instance, I would direct the Court's attention to Exhibit A of that, and this is at page 11, in which it shows that Molson and ABI have all of these interconnections and deals in which they brew for each other outside the United States. And so the idea that the only competitors in the United States are going to be Miller, Miller Coors and ABI, and they have 71 percent of the business, and they're not going to talk about anything? And they're not going to talk about their business? Well, of course they are, because they do business elsewhere throughout the world. In addition, I want to make clear about the distributors. They don't own the 600 distributors. They have control of 70 percent of the distributors. They have their distributors agree to be exclusive, and they also tell the distributors, and if you don't bring in anybody else, including craft brewers, if you don't bring craft brewers into it, then we're going to give you bonuses. In other words, they're trying to block out from all of these distributors throughout the United States, 70 percent of them, to try to make them exclusive. Now, on the other hand, Molson, for one reason or another, had a different theory, and theirs was you could produce any that you want. I mean, the distributors that they use, you could distribute even competitive beers. That's going to vanish. That's going to be gone. And there's no way that Molson, how did Molson, for example, how is it that Molson found out or determined that they were going to be the ones to buy the South African interest? And the idea that the South African interest and the Molson interest, that these two is just one company, is not true, because the South Africans had 58 percent of that joint venture, and in addition, they could vote, and they did vote. They had 50-50 on the vote on prices or anything else. All you have to do is veto it. You don't like the price, or you want to raise the price, you can do that. Now, so the simple fact of the matter is there used to be three of these giants. There shouldn't have been three giants to begin with, but we are hit with three giants, and now we have two. And that's the matter. Let me ask you, Mr. Alito, if it were to turn — you said that, yes, your intention would be to unwind the transaction. If it were determined that, in light of the factors that go into a court looking at that, that unwinding the transaction is not going to happen, do you still have remaining claims? Of course we do. Yes, Your Honor, we do. And those would be monetary — would they be a monetary claim? Is that what you're saying? Well, what happens is, is that Section 16 allows us to sue on the basis of a threat of injury. It can be a dollar injury. Right. A threat of injury. When it's consummated and it starts to take effect, now we are actually getting damage. And then it changes, and you can then amend to Section 4, and then you can amend to Section 5. Right. And I want to make another thing clear. Irreparable damage was already decided by Justice O'Connor when the case was whether or not private parties could get divestiture. And this was the American stores case. And as she said, she said the elimination of competition in any respect is irreparable injury because you can't get it back. And here we have — here we have somebody who has a part of 25 percent of the business, and he has the largest part. He has 58 percent of it, so he's got about almost 15 percent of it. Okay, he's gone. There was another item. I want the court to know there's a number of amicus briefs being filed against the government. I mean, the government usually does this thing and gets an immediate — gets a court to immediately approve it. Well, everybody went nuts because among other things — among other things that in the meantime has happened, which we would amend, there would be two items that I can think of now. One is that ABI has been going around buying up craft brewers throughout the specialties of the Pacific Northwest. That's an outrage. And then they produce beer that looks like craft brewing, but it's not. And they tried to do that. The second one is, what did Molson do when this happened? Molson happened to have a plant, 10 percent of its business, in Tennessee. And that was 10 percent of the business, and that plant brewed beer on a contract for Pabst Brew Ribbon. You're running out of time. I have one more question for you, and that is — Yes, sir. Yes, ma'am. If this case were affirmed in respect to the district court, would you still have the ability to bring a suit, antitrust suit, for damages with respect to the post-consummation transactions? The answer would be anybody could bring a lawsuit for that. And 19 beer drinkers could do this? Anybody could bring a lawsuit for that for damages. However, I would point out to you that that does not help in terms of being able to have opportunities opened up on a competitive basis. I understand your point. And that affects the entire country. And the example of Molson shutting down that plant and knocking Pabst out at the same time as this was going on, which means in a way that there is a new concentration, and then Pabst wanted to even buy the building, the plant. I mean, so the short answer is there would still be a potential claim. Is that right? Yes. Yes, Your Honor. Thank you. But then it would be under Section 4 of the Claims Act. Section 4, right. And you could still allege a — you could still allege Section 16 with regard to the But it would not and could not be nearly the same. It could not have the impact. It would not be as sweeping. It would not have the impact. Thank you. Thank you very much. The case just argued is submitted. I thank both counsel both for the excellent briefing and the argument.
judges: McKeown, Paez, Bashant